**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

BILLY GREEN, JR.,

      Plaintiff,

      v.

ALEJANDRO MAYORKAS, Secretary,
U.S. Department of Homeland Security,

      Defendant.

Civil Action No. 18-2589 (JEB)

<u>**MEMORANDUM OPINION**</u>

Plaintiff Billy Green, Jr. is a Black man born in 1968 who worked for U.S. Immigration and Customs Enforcement from 2000 to 2018.  Frustrated by the conditions in his office and unable to land one of the several other jobs he applied for within the agency, he brought this suit alleging a slew of discrimination and retaliation claims, including a hostile work environment, under Title VII and the Age Discrimination in Employment Act.

Defendant Alejandro Mayorkas, Secretary of Homeland Security, now moves for summary judgment, contending that Plaintiff's workplace conditions constituted neither an adverse employment action nor a hostile work environment, and that no reasonable jury could find that Defendant's explanations for not hiring him elsewhere or transferring him back to his original unit were pretextual.  The Court agrees and will grant the Motion.

I.    **Background**

Because the Court is considering Defendant's Motion for Summary Judgment, it will construe the facts in the light most favorable to Plaintiff.  See Talavera v. Shah, 638 F.3d 303,

308 (D.C. Cir. 2011).  As additional facts relating to Green's claims will be discussed later in the

Opinion, this section provides only a brief overview of the facts surrounding his work at ICE in

the years leading up to the filing of this suit.  It is undisputed that Plaintiff is a member of

multiple protected classes as a brown-skinned, African-American man who was over 40 at the

time of the relevant activity.  See ECF No. 25-1 (Def. MSJ) at 34; ECF No. 27-1 (Billy Green,

Jr. Deposition Transcript) at 12:9–14.  Further, no one denies that Green engaged in protected

activity by filing EEO complaints in 2011 and 2015.  See Green Dep. at 6:12–13; see also Def.

MSJ at 34; ECF No. 1 (Complaint), ¶ 11.

Green was voluntarily detailed to the Enforcement and Removal Operations Taskings and

Correspondence Unit within ICE in September 2014 and was permanently assigned there in

April 2015 at his own request.  See ECF No. 25-2 (Defendant Statement of Undisputed Material

Facts), ¶¶ 1, 3; see also ECF No. 31-1 (Plaintiff Response to Defendant's Statement of Material

Facts), ¶¶ 1, 3.  He remained in that Unit until he retired in September 2018.  Prior to working in

ERO Taskings, he had served most recently in the Law Enforcement Systems and Analysis, Data

Quality and Integrity Unit, as well as in other roles at ICE.  See SMF, ¶ 1; Compl., ¶ 352.

During his time in the ERO Taskings Unit, Plaintiff was a GS-14 Detention and

Deportation Officer.  See ECF No. 27-29 (Green Resumé) at 4.  He assisted ICE field offices

with responding to requests and messages from stakeholders relating to "enforcement and

removal activities" across the country.  See Green Dep. at 21:15–22.  While working in ERO

Taskings, Plaintiff's first-line supervisor was Dashanta Faucette, and his second-line supervisor

was Jacalynne Becker Klopp.  Id. at 14:23–24 & 15:1–2.  The ERO Taskings Unit was

understaffed between 2014 and 2015 as several members of the Unit departed around that period.

See SMF, ¶ 7; see also Green Dep. at 26:9–14.  At least in part, these individuals may have

transferred out because the Unit was no longer eligible for Administrative Uncontrollable

Overtime (AUO).  See Green Dep. at 60:13–22; see also ECF No. 31 (Pl. Opp.) at 2.  As a result

of the smaller staff, Plaintiff avers that he not only confronted an unduly large and stressful

workload, but that he was also forced to take on additional burdens when his work was overseen

by contractors.  See Green Dep. at 24:6–10 & 25:21–25.  Because others not in Plaintiff's

protected classes were able to transfer out of the Unit, he alleges that he faced discriminatory and

retaliatory treatment while forced to remain there.  See Compl., ¶¶ 47, 62–63.

Given his dissatisfaction in the ERO Taskings Unit, Green sought to change jobs,

applying to six positions within ICE and submitting two transfer requests, none of which he was

selected for.  He argues that he was rebuffed for discriminatory and retaliatory reasons.  See Pl.

Opp. at 19–24.  DHS counters that each instance of non-selection was based on a non-

discriminatory and non-retaliatory reason, such as Plaintiff's failure to use the correct application

process, a decision only to hire from the competitive list of applicants, and the presence of more

qualified candidates.  See Def. MSJ at 38–43.  Green sued the Department in November 2018,

bringing claims of discrimination under the Age Discrimination in Employment Act (Count I)

and Title VII based on his race, color, and sex (Counts II–IV), and a Title VII retaliation claim

(Count V).  See Compl., ¶¶ 392–447.  He also alleges a hostile work environment, although this

is not raised as a separate count in the Complaint.  Id., ¶ 390.

## II.    Legal Standard

Summary judgment must be granted if "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, 477 U.S. 242, 247–48 (1986); Holcomb v.

Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the

substantive outcome of the litigation.  See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  A dispute is "'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Liberty Lobby, 477 U.S. at 248; see also Scott v. Harris, 550 U.S. 372, 380 (2007); Holcomb, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(B).

In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc).  The Court must "eschew making credibility determinations or weighing the evidence."  Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).  The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The non-movant, in other words, is required to provide evidence that would permit a reasonable jury to find in his favor.  See Laningham v. U.S. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

## III.   Analysis

Defendant moves for summary judgment on two grounds.  First, it contends that because Green did not suffer an adverse employment action in the ERO Taskings Unit, he has not established a *prima facie* Title VII or ADEA case for his claims relating to conditions in that

Unit.  In Defendant's view, those conditions also did not rise to the level of a hostile work environment.  Second, the agency posits that Green has failed to rebut its legitimate, non-discriminatory, and non-retaliatory explanation for each of his rejections from the positions and transfers he sought.  See Def. MSJ at 35, 38, 43.

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Similarly, the section of the ADEA governing federal agencies states that "[a]ll personnel actions affecting employees or applicants for employment who are at least 40 years of age . . . shall be made free from any discrimination based on age."  29 U.S.C. § 633a(a).  Both statutes also prohibit retaliation against employees who engage in protected activity, such as filing a complaint with the EEOC.  See Baloch v. Kempthorne, 550 F.3d 1191, 1198 (D.C. Cir. 2008).

 "[I]n the absence of direct evidence of discrimination," the framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–05 (1973), governs both Title VII claims and "disparate-treatment claims under the ADEA."  Teneyck v. Omni Shoreham Hotel, 365 F.3d 1139, 1155 (D.C. Cir. 2004).  Under that framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by demonstrating that "(1) []he is a member of a protected class; (2) []he suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination."  Stella v. Mineta, 284 F.3d 135, 145 (D.C. Cir. 2002) (internal quotation marks and citation omitted).  Similarly, in establishing a *prima face* case of unlawful retaliation, "a plaintiff must show: (1) that he opposed a practice made unlawful by Title VII; (2) that the employer took a materially adverse action against him; and (3) that the

employer took the action 'because' the employee opposed the practice." McGrath v. Clinton, 666 F.3d 1377, 1380 (D.C. Cir. 2012).

For discrimination claims, a defendant may rebut a *prima facie* showing with evidence of a "legitimate, nondiscriminatory reason" for its choices. Stoe v. Barr, 960 F.3d 627, 639 (D.C. Cir. 2020) (quoting Holcomb, 433 F.3d at 896). If the employer succeeds, the burden then returns to the plaintiff, who must show that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000) (quoting Tex. Dep't of Cmty Affairs v. Burdine, 450 U.S. 248, 253 (1981)). When, however, "an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not — and should not — decide whether the plaintiff actually made out a prima facie case under McDonnell Douglas." Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008). The Court's sole task in such cases is to "resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" Id.; see Evans v. Sebelius, 716 F.3d 617, 620 (D.C. Cir. 2013) (explaining that courts evaluate this question "in light of the total circumstances of the case," including "the plaintiff's *prima facie* case") (quoting Hamilton v. Geithner, 666 F.3d 1344, 1351 (D.C. Cir. 2012)).

To defeat summary judgment, the plaintiff must "present[] enough evidence to allow a reasonable trier of fact to conclude that the employer's proffered explanation is unworthy of credence." Desmond v. Mukasey, 530 F.3d 944, 962 (D.C. Cir. 2008) (internal quotation marks and citation omitted). This may be done in a variety of ways including by presenting "evidence

suggesting that the employer treated other employees of a different race, color, religion, sex, or national origin more favorably in the same factual circumstances" or that "the employer is making up or lying about the underlying facts that formed the predicate for the employment decision."  Brady, 520 F.3d at 495.

Similarly, for retaliation claims, "the defendant's rebuttal may take the form of a 'non-retaliatory explanation' for its action."  Moss v. Hayden, No. 18-470, 2020 WL 4001467, at *3 (D.D.C. July 15, 2020) (quoting Jones v. Bernanke, 557 F.3d 670, 678 (D.C. Cir. 2009)).  As in discrimination cases, if the plaintiff has suffered an adverse employment action and the defendant has asserted a legitimate, non-retaliatory reason for its decision, the Court simply considers whether the plaintiff "has produced sufficient evidence for a reasonable jury to find that [the defendant's] asserted reasons for each action were mere pretexts for illegal retaliation." Alford v. Def. Intel. Agency, 908 F. Supp. 2d 164, 172 (D.D.C. 2012) (citing Brady, 520 F.3d at 494); see also id. (explaining that Brady's "streamlined framework applies to retaliation claims").

The Court will start with Green's claims about conditions in the ERO Taskings Unit before addressing whether he has provided sufficient evidence to rebut Defendant's explanations as to his non-selection and transfer-denial claims.

A.  Workload and Conditions

Plaintiff presents a litany of grievances about the conditions in the ERO Taskings Unit with a focus on three areas: 1) the heavy workload and stressful environment; 2) unpleasant interactions with contractor staff working in the Unit; and 3) assorted other complaints such as being treated less favorably than his colleagues.  He states that similarly situated employees outside of his age, race, color, and sex were not subject to these circumstances, which negatively

affected his job performance.  See Pl. Opp. at 16; see also Compl., ¶¶ 394, 403, 415, 426.  He asserts that he was "being punished" in the Unit "for [his] past EEO activity and protest of . . . things. . . that were not being changed that were not effective."  Green Dep. at 186:4–8.  Before delving into whether any of these attestations satisfies the requirements for a Title VII or ADEA claim, the Court lays out in some detail the circumstances that gave rise to Green's complaints.

Between September 2014 and his retirement in September 2018, Green avers that the Taskings Unit had insufficient staff, leaving him and one other Black man with a disproportionate workload.  See Pl. Resp. SMF, ¶ 4.  Both parties agree that supervisors in the Unit did not set deadlines, see SMF, ¶ 5; Pl. Resp. SMF, ¶ 4, that officers like Green could choose tasks to work on at their own pace, see Green Dep. at 35:3–6; SMF, ¶ 6, and that "Plaintiff was never reprimanded for not taking enough work."  SMF, ¶ 6.  Green maintains, however, that there was an expectation that the staff would keep up with tasks and "pick up for each other's work."  Pl. Resp. SMF, ¶ 4.  Some of his colleagues, moreover, would "not perform their duties" or not perform them quickly enough.  See Green Dep. at 33:1–2.  As a result, he concludes that he "did more of his share to ensure his unit's accountability than anyone else."  Pl. Opp. at 3.

With respect to the contractor staff, Green states that his supervisors had him work in an inefficient manner in which he sent work "back and forth" to contractor staff for review.  See Green Dep. at 38:1–6; see also SMF, ¶ 8.  Both parties agree, however, that these steps were not unique to him, but "applied to all of the Detention and Deportation Officers in ERO Taskings."  SMF, ¶ 8; see also Green Dep. at 28:22–25 & 56:3–13.  Green also states that one of his supervisors, Becker Klopp, also permitted the contractor staff to speak rudely to him and "make demands" of him.  See Green Dep. at 108:1–6.

In addition, Green outlines various disagreements with members of the contractor staff who worked in the Unit, including incidents in which they made disparaging comments about his work, see Green Dep. at 102:21–22 (describing one of his tasks as "bullshit" in an email to the ERO Tasking mailbox), acted like he was their subordinate by asking him about the status of tasks, id. at 96:9–25, and made "false allegations based on questions that were asked of [him]" that resulted in "several frivolous allegations." Id. at 99:12–18.  Green "only made one report about [a] contractor [] to management" following an incident in which she asked him "in a tone that was really inappropriate" about a task that he was not even working on. Id. at 96:11–14; SMF, ¶ 9.  Thereafter, Green worked to address issues with the contractor staff on his own. See Green Dep. at 96:24–25.

Green argues that other employees who did not share his protected characteristics were not forced to endure these same circumstances because they were able to transfer out of the Taskings Unit.  The four employees who departed during Plaintiff's time there were Janice Guiden, Clint Haggard, Jennifer Lamoureux, and Roberto Salazar. See Green Dep. at 26:10–13; see also Compl., ¶¶ 64, 68.  Notably, one is Black and two were born around the same time as Green. See Def. MSJ at 7; Green Dep. at 87:3–4.

Plaintiff also cites an incident in July 2015 in which Becker Klopp took a White employee out to lunch but did not do the same for other employees. See Green Dep. at 94:1–3. The Court need not belabor this incident, however, because Green acknowledges that it "most likely is not a tangible employment action by itself that changed the rights, benefits or legal conditions of employment," nor an indication of a hostile work environment. See Pl. Opp. at 19.

Finally, in his Complaint, Green states that during the period in which he was decertified from receiving overtime for his work in the ERO Taskings Unit, some of his colleagues

continued to be eligible.  See Compl., ¶ 98.  In the course of discovery, it became clear that his

real complaint is that he was not able to transfer to an AUO-eligible position, while some of his

former colleagues did and thus received overtime.  See Green Dep. at 77:19–24 & 78:2–6; see

also Compl., ¶¶ 103–04.  He does not suggest that some in the Unit received overtime while he

did not.  As a result, this issue is encompassed in Plaintiff's claims regarding transfer and non-

selection, which will be discussed later.  The Court now turns to whether the facts just described

can support claims of retaliatory or discriminatory employment activity or a hostile work

environment.

       1.  *Adverse Employment Action*

One necessary element of an employment-discrimination or -retaliation suit is that "the

plaintiff suffered an adverse employment action."  Brady, 520 F.3d at 493.  In discrimination

cases, such an adverse action is "a significant change in employment status, such as hiring,

firing, failing to promote, reassignment with significantly different responsibilities, or a decision

causing a significant change in benefits."  Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761

(1998).  Meanwhile, "in the retaliation context," the term "encompass a broader sweep of actions

than those in a pure discrimination claim."  Baloch, 550 F.3d at 1198 n.4.  For a claim of

retaliation, "an action is adverse if it would have 'dissuaded a reasonable worker from making or

supporting a charge of discrimination.'"  Crowley v. Vilsack, 236 F. Supp. 3d 326, 330 (D.D.C.

2017) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)).  The action

must also be materially adverse so as "to separate significant from trivial harms . . . such as the

sporadic use of abusive language."  Burlington N., 548 U.S. at 68 (internal citations and

quotation marks omitted).  Plaintiff's briefing indicates — albeit not the most pellucidly — that

"the case has to be analyzed in terms of the totality of the claims," rather than specifying any

particular work condition he considered an adverse action.  See Pl. Opp. at 17.  Whether

considered together or apart, however, the conditions Green describes do not constitute an

adverse employment action for either a discrimination or a retaliation claim.

First, Green's workload may have increased following his colleagues' departure, but he

does not allege that his supervisors singled him out; rather, the burden fell on fewer shoulders

given the reduced staff.  "Scarce resources and increased workloads are familiar complaints in

virtually every workplace and every industry, but they do not give rise to a discrimination claim

under Title VII.  They are merely the 'ordinary tribulations of the workplace,' which employees

should expect from time to time."  Rattigan v. Gonzales, 503 F. Supp. 2d 56, 73 (D.D.C. 2007)

(quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)); see also Mack v. Strauss,

134 F. Supp. 2d 103, 113 (D.D.C. 2001), aff'd, No. 01-5122, 2001 WL 1286263 (D.C. Cir. Sept.

28, 2001) ("allegedly increased workload does not constitute an actionable injury because it was

not accompanied by some other adverse change in the terms, conditions or privileges of

employment").  Even in the broader context of a retaliation claim, "unreasonable deadlines and

reporting requirements" — conduct more extreme than that at issue here — are "unlikely to

prevent a reasonable employee from engaging in protected activity and therefore do[] not amount

to . . . materially adverse action[s]."  Morales v. Gotbaum, 42 F. Supp. 3d 175, 198 (D.D.C.

2014) (noting also that pressure and stress may have increased when plaintiff "was also covering

for co-workers" but did not create adverse action).

Second, Plaintiff's disputes with members of the contracting staff did not rise to the level

of material adversity or a change in his employment situation, nor did they reflect some type of

discrimination against him by his supervisors.  Although the rude comments made by contractors

were no doubt irritating, "those petty slights or minor annoyances" do not meet the standard

because "all employees experience" things like "snubbing by supervisors and co-workers."

Burlington N., 548 U.S. at 68 (internal citation and quotation marks omitted); see also Ramsey v.

Moniz, 75 F. Supp. 3d 29, 53 (D.D.C. 2014) (being questioned about report status in a "very

harsh and angry tone" not adverse action).  Indeed, Green decided to handle his disputes with the

contracting staff himself and only lodged one complaint with management about them.  In

response to that complaint, Becker Klopp worked to address the situation and met with the

manager of the contractor staff team about the issue.  See Green Dep. at 101:23–24; see also

ECF No. 27-5 (2016 Affidavit of Jacalynne Becker Klopp) at 18.  And, as previously noted, a

supervisor taking one employee to lunch and not another does not warrant further discussion.

2.  *Hostile-Work-Environment Claim*

Plaintiff also has not made out a hostile-work-environment claim.  Title VII's protections

extend not just to "'economic' or 'tangible' discrimination," but also "include[] requiring people

to work in a discriminatorily hostile or abusive environment."  Harris v. Forklift Sys., Inc., 510

U.S. 17, 21 (1993) (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986)).  A

hostile work environment arises when a "workplace is permeated with 'discriminatory

intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions

of the victim's employment and create an abusive working environment.'"  Harris, 510 U.S. at

21 (quoting Meritor Savings Bank, 477 U.S. at 65, 67).  In assessing whether this standard is

met, courts look to a variety of factors, including "whether [the conduct] is physically

threatening or humiliating, or a mere offensive utterance;[] whether it unreasonably interferes

with an employee's work performance," id. at 23, as well as whether there were circumstances a

"reasonable . . . person would find hostile or abusive, and one that the victim in fact did perceive

to be so."  Faragher, 524 U.S. at 787.

Although Plaintiff describes his work environment as "hostile," see Compl., ¶ 390, and the heavy workload may well have been unpleasant, none of the facts established suggests that his supervisors' or colleagues' behavior was "physically threatening or humiliating."  At most, Green has described an overburdened office with friction between him and the contractors.  This in no way suffices to make out a hostile-work-environment claim.  See, e.g., Jimenez v. McAleenan, 395 F. Supp. 3d 22, 36 (D.D.C. 2019) (imposition of deadlines that were allegedly "impossible to meet" not sufficient to establish hostile work environment).

Because none of Plaintiff's claims about his workplace in the ERO Taskings Unit rises to the level of being an adverse employment action or establishing a hostile environment, summary judgment is warranted.

B.  Failure-to-Hire or -Transfer Claims

Next up are Green's claims regarding Defendant's failure to hire him for other positions or to approve his transfer requests.  Because the Government has offered a specific, legitimate, non-discriminatory, and non-retaliatory reason for each such decision, the Court need only consider whether Plaintiff has "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee . . . ."  Brady, 520 F.3d at 494; see also Waggel v. George Washington Univ., 957 F.3d 1364, 1376 (D.C. Cir. 2020) (same requirement to dislodge employer's legitimate, non-retaliatory explanation).  It will categorize Plaintiff's evidence as to this question by the various types of explanations the Government has provided.

1.  *Jobs Where Green Applied Improperly*

According to Defendant, Green was not selected for several positions because he submitted his materials outside the required hiring process.  In March 2014, for example, he

applied for Vacancy 100, a role as a Detention and Deportation Officer in ERO's Criminal Alien Division, by emailing the selecting official.  See ECF No. 27-13 (Email from Green to Matthew Albence).  Defendant maintains that it did not consider Plaintiff because his application was not submitted through the USAJobs portal as required in the job announcement.  See ECF No. 27-14 (Vacancy 100 Listing) at 4–5.  Indeed, no one was ultimately hired for this role.  See SMF, ¶ 12. Plaintiff rejoins that this explanation must not be legitimate because the selecting official could have told Green to apply through USAJobs, see Pl. Opp. at 7, and that email submissions were accepted for other roles to which he applied.  Id. at 19–20.  Yet Green offers no evidence that Albence, who did not know Plaintiff, was motivated by discriminatory or retaliatory intent.  See Compl., ¶ 205.  Without more, this can hardly undermine Defendant's explanation.

In July 2014, Green also applied to Vacancy 130 in the Deportation Office of ERO's Alternatives to Detention Program.  See ECF No. 27-16 (Email from Green to Tae Johnson).  He sent his materials to Tae Johnson, ERO's Assistant Director for Custody Management, who was the selecting official.  Id.  When Green followed up, Johnson indicated that he had forwarded his materials to the relevant reviewing officials, but upon later search of his email archives, Johnson realized that he had not done so.  See ECF No. 27-17 (Tae Johnson Interrogatories) at 2.  In his brief, Plaintiff raises in a footnote that there is "an issue of fact . . . as to whether the Plaintiff's resume and application were purposely not forwarded for review."  Pl. Opp. at 20 n.5.  Beyond this hypothesis, however, he provides no evidence either to suggest that Johnson's explanation was false or to show potential discriminatory or retaliatory intent.  Johnson had met Green and so was aware of his race, color, age, and sex, but not necessarily his EEO activity.  See Green Dep. at 173:23–25.  When asked in his deposition whether Johnson might have discriminated against him, however, Green stated only that  "it's possible" because "other than not being complacent

[*sic*], I can't think of any other reason why I would not have been considered for the job."  Id. at 174:6-13.  Plaintiff's own determination that he should have been considered does not undercut Johnson's testimony.  See, e.g., Waterhouse v. D.C., 124 F. Supp. 2d 1, 7–8 (D.D.C. 2000), aff'd, 298 F.3d 989 (D.C. Cir. 2002) (Plaintiff's "own subjective assessment of [his] own performance" and relative qualifications alone "cannot establish pretext").

### 2. *Job Where Only One Selection List Used*

In several instances, Defendant explains that it did not consider Green for roles to which he applied because the hiring officials used only a particular list of eligible candidates, which did not include Plaintiff.  ICE has two lists for candidates: 1) the "non-competitive" list for applicants who "have already met the minimum qualifications [because they are currently at the relevant General Schedule-grade level] for [the] position that they are applying for at the time of the closing of the vacancy announcement"; and 2) the "competitive" list for applicants who have "met the qualifications at the lower level" and are for the first time vying to move up to a higher grade level.  See ECF No. 31-2 (Deposition of Theresa Perez) at 27:6–9, 20–22 & 28:1–14.  For example, a candidate with the grade level of GS-13 applying for a GS-14 role would be "competitive," while a candidate with a GS-14 grade level applying for that same role would be "non-competitive."

Plaintiff was not selected for Vacancy 95 because he applied as a non-competitive candidate, but the official running the review process, Caleb Vitello, chose to hire only from the competitive list.  See ECF No. 27-37 (Affidavit of Caleb Vitello) at 3.  Vitello justified the use of the competitive list as a way "to avoid the appearance of impropriety and ensure a fair process where the qualifications of the candidates are evaluated by a third party (Human Resources)." Id.  For Vacancy 118, the reviewing official chose to review only the applicants from the GS-13

competitive list because "it had a larger pool of applicants with recent Field experience," specifically "Deportation Officers that conducted ground work for ERO."  ECF No. 27-52 (Affidavit of Norman Parrish) at 2.  For two of the positions under Vacancy 119 — those in Custody Programs and Law Enforcement Systems and Analysis — Green was again not considered because the hiring officials used only certain lists.  See ECF No. 27-82 (Affidavit of Mai Mozelle) at 4 (describing decision to start with list of GS-13 candidates); ECF No. 27-77 (Affidavit of Jason Mitchell) at 3 (explaining that particular list was used to identify candidates with "Field level knowledge").  There is no dispute that Plaintiff was not on the lists used in the selection for any of these positions.  See SMF, ¶¶ 14, 15, 18, 19, 24, 25; see also Pl. Resp. SMF, ¶¶ 14, 15, 18, 19, 24, 25.  Rather, the bulk of his critique centers on perceived inconsistencies in when different lists were used and Defendant's failure to consider how its own Rule 30(b)(6) witness's statements undermine the non-discriminatory and non-retaliatory explanations.  See Pl. Opp. at 20–22.

Addressing first the statements of the 30(b)(6) witness, ICE Supervisory Human Resource Specialist Theresa Perez, her deposition testimony does not contradict Defendant's explanations about how the competitive lists were used.  In discussing one of the roles Plaintiff was not chosen for, Perez stated that "[t]he selecting official is not required to use all of the [lists] that they are provided as long as there's ample justification," such as seeking someone with certain qualifications like current field experience.  See Perez Dep. at 59:5–7; see also id. at 29:19–20 ("not a requirement for the selecting official to select or consider all certs [certificate lists, such as the competitive or non-competitive list]").  Because the hiring official may be evaluating based on experiences not directly tied to the applicant's GS-grade level, "[s]omeone

[who] meets the minimum quals doesn't always necessarily mean that they're the best qualified candidate for the job." Id. at 60:6–9.

This Circuit has upheld this practice by agencies, holding that it is unobjectionable for an agency to advertise a position with "both a status and a non-status vacancy announcement," and then choose to consider only one list and "not consider anyone on the" other. Montgomery v. Chao, 546 F.3d 703, 705, 709 (D.C. Cir. 2008); see also Walker v. Johnson, No. 11-816, 2013 WL 12061037, at *5 (D.D.C. Dec. 20, 2013), aff'd, 798 F.3d 1085 (D.C. Cir. 2015) (finding legitimate explanation not rebutted when only one list of candidates considered). There is also nothing inherently wrong in posting a job for multiple categories, as "[a] dual posting expands the field of eligible candidates and avoids re-posting if the selecting official is dissatisfied with the list of preferred candidates." Walker, 2013 WL 12061037, at *5 n.6. Plaintiff's cited examples of jobs he applied to in which the hiring officials considered both sets of candidates do not vitiate the fact that selecting officials have the choice of which list, or both, to review. Cf. Pl. Opp. at 22–23.

Green also attempts to cast doubt on "[t]he Agency's defense that the Plaintiff could have applied on both lists" by arguing that it "is not supported in the record[,] . . . [and] the Agency's 30(b)(6) [designee] couldn't explain how that was possible." Pl. Opp. at 21. Defendant has never explicitly raised this as a defense, but, regardless, Perez in fact did explain that the application "actually affords an opportunity for the applicant to be on both certs" so that his resumé will be seen no matter which list is used. See Perez Dep. at 56:2–4. And she elaborated that doing so would have benefited Green because "he would have been included in the selection cert that they identified and used for their selection for this particular position." Id. at 59:1–4.

Green also takes issue with the fact that different reviewing officials offered different explanations for relying on a particular list — an inconsistency that he suggests reveals that an alternate, more nefarious motive was the true basis for the decisions.  See Pl. Opp. at 21–22; see also Walker, 798 F.3d at 1094 ("shifting and inconsistent justifications are probative of pretext") (internal citations and quotation marks omitted).  Here, however, Defendant has not offered shifting justifications as to the use of a certain list for the same vacancy; rather, for different vacancies, different officials offered varied explanations.  See Hendricks v. Geithner, 568 F.3d 1008, 1014 (D.C. Cir. 2009) (holding no inference of discrimination when in one instance competitive candidates were considered and in one they were not, as hiring officer had discretion over what to do).  There is also nothing facially pretextual or inconsistent about the explanations given.  See Chatman v. Perdue, No. 17-1826, 2020 WL 6075678, at *6 (D.D.C. Oct. 15, 2020) (finding agency's explanation legitimate in case involving individual on non-competitive list who contested use of only competitive list for hiring.).

More importantly, Plaintiff does not offer any evidence, either "direct or circumstantial, that permits an inference of discrimination" or retaliation regarding the officials involved in the selection process for these four roles.  Holcomb, 433 F.3d at 899.  At most, he alleges that certain selecting officials knew of his race, color, and sex.  See Compl., ¶¶ 205, 223, 259, 263, 267.  For one selecting official, Matthew Albence, Green assumed that Albence knew of his protected activity — despite never having met him — because he was in management and must have discriminated against Green because "of my high-level qualifications, and me being a noncompetitive officer for positions underneath his area of responsibility."  Green Dep. at 182:10–21.  Being highly qualified, however, is not a protected class under Title VII and the ADEA, and Green does not provide any "discriminatory statements by the employer, . . . other

attitudes suggesting the decision maker harbors discriminatory animus [as to a protected class], [or] . . . data showing that the defendant employs members of the plaintiff's protected class at rates far below their numbers in the applicant pool and the general population." Holcomb, 433 F.3d at 899.  A policy of using only one list, moreover, does not specifically target Plaintiff; it affects all individuals on the non-competitive list regardless of their race, age, color, or sex.

### 3.  *Jobs Where More Qualified Candidate Hired*

Defendant next explains that there were also four roles for which Green applied but was not selected because he was not the most qualified candidate.  "A plaintiff attacking a qualifications-based explanation may establish pretext by either (1) presenting evidence showing a reasonable employer would have found the plaintiff significantly better qualified for the job but nevertheless failed to offer the position to [him] . . . or (2) expos[ing] other flaws in the employer's explanation," such as that the explanation is made up or misstates the applicant's experience.  Jeffries v. Barr, 965 F.3d 843, 861 (D.C. Cir. 2020) (internal quotation marks and citations omitted).  A plaintiff can also always offer other evidence "that permits an inference of discrimination" or retaliation.  Holcomb, 433 F.3d at 899.

The positions Plaintiff was rejected from based on his qualifications were Vacancy 103, a Detention and Deportation Officer in the Post Order Custody Review Unit; Vacancy 133, a Detention and Deportation Officer in ERO's Travel Document Unit; and two roles under Vacancy 119 in the Detention Monitoring Unit and the Juvenile and Family Residential Unit.

### a.   Vacancies 103 and 133

For Vacancy 103, Green received the lowest resumé-review score among the non-competitive candidates, and ICE hired the candidate with the second-highest score among

the Merit Promotion Certificate candidates.  <u>See</u> ECF No. 27-49 (Resumé Review Scoring).

Similarly, for Vacancy 133, Defendant explains that the two individuals chosen had relevant

experience that Plaintiff lacked involving the operations of the Travel Document Unit and

communications relating to ICE.  <u>See</u> ECF No. 27-30 & ECF No. 27-31 (Hiring

Recommendations for Selected Applicants).

        The hiring official for both vacancies was Marlen Pineiro.  Green knew her from

"working at Headquarters," Green Dep. at 174:25–175:1, and thus assumed that she "was aware

of his race, color, age, [and] sex," <u>id.</u> at 175:2–4, as well as his EEO activity since "she's a

manager within Headquarters" and is "associates or friends with individuals" involved in his past

claims.  <u>Id.</u> at 175:7–8 & 175:11–13.  Once again, Plaintiff does not provide sufficient evidence

to create a question of material fact as to whether Pineiro discriminated or retaliated against him

— offering only the rationale that she must have because "I have no understanding of why my

resume was not considered for a position in which a much lower-level staff member had been

hired in my place."  <u>Id.</u> at 176:22–24.  In both instances, however, Green does nothing "to justify

an inference of discrimination [by showing that] the qualifications gap [is] great enough to be

inherently indicative of discrimination" or retaliation.  <u>Holcomb</u>, 433 F.3d at 897.  All that he

points to is that the selected candidates were of a lower rank than he was.  He also does not

dispute the factual bases for the Government's explanations, such as his own low resumé score

for Vacancy 103 or lack of relevant experience in the Travel Document Unit for Vacancy 133.

<u>See</u> SMF, ¶¶ 13, 16; Pl. Resp. SMF, ¶¶ 13, 16.  Even if Plaintiff does not agree that he "deserved

that score," Pl. Resp. SMF, ¶ 16, he has not offered any reason or evidence to explain why this is

the case.

        b.  Vacancy 119

For Vacancy 119, Plaintiff objects to Defendant's non-discriminatory and non-retaliatory explanation that other candidates were selected because they were more experienced and suggests that this cannot be the true reason for the Department's decision.  He does not offer any evidence of discrimination or retaliation in the selection, however.

The selected candidates for the role in Custody Management: Detention Monitoring were Michael Woodring and Fernando T. Armenta, but Green does not address Armenta's selection at all.  See ECF No. 27-67 (Merit Promotion Certificate of Eligibles) at 5–6.  The Government explains that Woodring was chosen because of his detention-related experience including involvement with the rollout of the "2008 Performance Based National Detention Standards and [that he] has a strong grasp of the ICE standards."  ECF No. 27-65 (Hiring Recommendation Memo).  Plaintiff's argument for pretext focuses entirely on the fact that he was a GS-14 and Woodring was only a GS-12.  A discrepancy in GS level alone, when the selected candidate has other relevant qualifications, does not create a genuine dispute as to Defendant's explanation. See Francis v. D.C., 731 F. Supp. 2d 56, 74 (D.D.C. 2010) (holding that "no reasonable jury could find [candidate] unqualified for the position" even though he was two grades lower than plaintiff's position given candidate's other employment and educational experience).  Even if Plaintiff does have additional detention experience "other than putting ankle bracelet monitors on detainees," Def. MSJ at 42; but see Green Dep. at 136:7–8 (describing other experience), the Court will not second guess Defendant's decision that Woodring's specific experience with the National Detention Standards rollout was valuable.  See Jackson v. Gonzales, 496 F.3d 703, 709 (D.C. Cir. 2007) ("The fact that an employer based its ultimate hiring decision on one or more specific factors encompassed within a broader and more general job description does not itself raise an inference of discrimination sufficient to overcome summary judgment.").

Finally, in contesting Defendant's qualifications-based explanation as to why other candidates were selected for roles in the Juvenile and Family Residential Unit, Green quibbles with the claim that one of the other candidates, Karlo Midel, was chosen "because of his alleged recent experience as a Field Office Juvenile Coordinator," when, in fact, Midel had most recently served in two other positions where he did not work with juveniles.  See Pl. Opp. at 12–13. Plaintiff is correct that two more recent roles appear on Midel's resume, see ECF No. 27-75 (Karlo Midel Resume), but he did serve as a Juvenile Coordinator in a field office from 2012 to 2014, affording him "recent experience" in the role, as the Government claimed when selecting him in 2015.  See ECF No. 27-72 (Midel Recommendation).  This cannot possibly create a jury question as to pretext, especially as Midel had one of the top scores from the resumé-review and interview process.  Green does not object to the hiring of the second candidate, who also received a high score, except to note that he was at a lower GS-grade level than Plaintiff.  See Pl. Opp. at 13.

### 4.  *Other Transfer Claims*

Green also tried to move to other parts of ICE by submitting lateral transfer requests rather than applying to the listed vacancies.  In February 2014, he emailed a request to work in the Homeland Security Investigation's Baltimore field office.  See ECF No. 27-2 at 3 (Green Email about Transfer Request).  The Department contends that Plaintiff was informed that he would need to apply directly to HSI for the relevant position because it "was a separate component within ICE" and offered to assist him with his application.  See ECF No. 27-12 (Affidavit of Marc Rapp) at 3.  Green does not contest this legitimate explanation or offer any evidence to suggest that the officials who received his transfer request intended to discriminate or retaliate against him.  Indeed, this request is not discussed in his briefing at all.

Next, in September 2015, Plaintiff sought "to return to his original job at Law Enforcement Systems and Analysis."  Pl. Opp. at 23; see also ECF No. 27-86 (Green Email); ECF No. 27-6 (Affidavit of Tom Homan) at 9.  Green's supervisors handling this transfer request indicated that they were informed by ICE's Office of the Principal Legal Adviser that because Green was represented by counsel in relation to his EEO activity (he had complained to an EEO counselor in August 2015), "it would be inappropriate to communicate with him on the matter at that time."  ECF No. 27-44 (Affidavit of Jacalynne Becker Klopp) at 6; see also Homan Aff. at 11.  His supervisors also believed that ICE "attorneys had made numerous attempts to communicate with Complainant's attorney regarding his request for lateral reassignments."  Homan Aff. at 11.  They thus did not communicate with Green himself about the request.  At the time, Plaintiff told one of his supervisors, Tom Homan, that he did not think it was "necessary" for ICE attorneys to be involved.  See ECF No. 27-87 (Email from Green to Homan).

Plaintiff's main complaint in rebuttal is that his transfer should have been accomplished without a lawyer and that Defendant's explanation about the need for one is unconvincing.  Although "[i]t might be true that [he] had a lawyer to represent him during the EEO process," he states, that is "not equivalent to having a lawyer represent a federal employee for each and every personnel move that [the] employee desires to make," which would create such an absurd burden that it is almost "per-se retaliation activity."  Pl. Opp. at 23–24.  Indeed, Plaintiff suggests that his inability to transfer was an instance of retaliation, explaining that "the agency set up a condition for which the Plaintiff couldn't return to his original job.  Arguably, that was because of his prior EEO activity [of] which the Agency was aware."  Id. at 26.

Although communication between lawyers is certainly not required for every transfer request in the federal government, Plaintiff has offered no evidence to suggest that the belief that

lawyers were needed is pretextual or motivated by retaliation in the specific circumstances where an individual is already represented by counsel. Both Homan and Becker Klopp knew of his EEO Complaint at the time of Plaintiff's 2015 transfer request. See Homan Aff. at 3; 2016 Becker Klopp Aff. at 6. Plaintiff's response, however, does nothing to cast doubt on the Government's non-retaliatory explanation. Even if the legal advice provided to Homan and other supervisors was incorrect, as Green seems to suggest, "the issue is not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers." Fischbach v. D.C. Dep't of Corr., 86 F.3d 1180, 1183 (D.C. Cir. 1996) (internal quotations marks and citation omitted) (cleaned up).

*     *     *

Finally, Plaintiff indicates that even if each of the failure-to-hire or -transfer claims alone was not a basis to find that he had been discriminated or retaliated against, the cumulative effect of his repeated rejections "presents a true picture of [his] case" and reveals the Government's explanations as inconsistent. See Pl. Opp. at 17. This hail-Mary argument finds no traction. Although the Court acknowledges that Defendant used different hiring processes for different positions, the fact that Green was rejected from multiple jobs does not, in and of itself, suggest that the hiring officials had improper motives when, as here, Plaintiff has not offered sufficient evidence to create a genuine dispute of material fact as to any of the explanations given. See Oliver-Simon v. Nicholson, 384 F. Supp. 2d 298, 314 (D.D.C. 2005) ("Although several non-selections may be disheartening for plaintiff, the sheer number of non-selections alone is not sufficient to establish that defendant's proffered justifications were a pretext for discrimination.").

24

**IV.    Conclusion**

For the foregoing reasons, the Court will grant Defendant's Motion for Summary

Judgment.  A separate Order so stating will issue this day.


/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  November 29, 2021